UNITED STATES of America, Plaintiff–Appellee,

v.

Tamara Jo SMITH, Defendant–Appellant.

No. 86–2994.

United States Court of Appeals, Seventh Circuit.

Argued May 27, 1988.

Decided Feb. 21, 1989.

---

Thomas S. Moore, and Jane F. Anderson, McCarthy, Duffy, Neidhart & Snakard, Chicago, Ill., for defendant-appellant.

Lawrence Rosenthal, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before POSNER, MANION and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Defendant Tamara Jo Smith was charged in the Northern District of Illinois with conspiracy to commit bank and wire fraud, and substantive counts of bank, credit card and wire fraud. She was convicted of 31 of the 37 counts with which she was charged. Smith challenges the use of a spectrographic voice identification expert at trial, the district court's denial of her motion to sever her trial from that of her identical twin sister, and the validity of the grand jury which indicted her. We affirm.

## I. Facts

Tanya and Tamara Smith are identical twins who are commonly mistaken for one

another. Some of their friends, however, could distinguish them by a small scar on Tanya's forehead.

In their scheme, the two women posed as bank employees and telephoned banks authorizing them to make fictitious wire transfers of nonexistent funds. They then arranged for various individuals to pick up the money at transferee banks or at Western Union. These persons would keep a small portion for themselves and turn the bulk over to the twins.

The two women were indicted and tried together. Because identity[1] was a core dispute at trial, the government called a spectrographic voice identification expert to testify. The original voice identification expert, who prepared the spectrograms at issue here, was unable to testify at the last minute. The expert who testified was a substitute who was called in for the trial. Tamara challenges this expert testimony. She protests the use of spectrographic voice identification testimony in general, alleging that it is not generally accepted by the scientific community. She also contends that admission of the substitute expert's testimony violated her rights under the confrontation clause. If the person who actually prepared the spectrograms had been present to testify, Smith argues, she would have been able to discredit his qualifications and to establish that several trials in which his mentors had testified had been reversed because of the voice identification testimony.

Tamara Smith also contends that she should have been tried separately from her sister Tanya. She argues that trying them together caused her undue prejudice.

The term of the grand jury which returned the indictments of Tamara Smith and her sister had not properly been extended. Its initial 18 month term had expired at the end of March, 1986, but Smith was indicted after that time.[2] Judge McGarr issued a *nunc pro tunc* order extending the term. Thus, in addition, Ta-

mara challenges the authority of that grand jury to indict her.

## II. Voice Identification Expert Testimony

Dr. Hirotaka Nakasone testified as an expert witness and voice examiner. He compared the recorded voices of Tanya and Tamara Smith to the recorded voice of the person who called the Harris Bank on November 23, 1984 and falsely identified herself as a bank employee attempting to arrange a wire transfer. He concluded that it was highly probable that this was Tanya Smith and highly probable that it was not Tamara Smith. He found that it was probable that Tanya, not Tamara, telephoned Northern Trust Bank on May 21 and 22, 1985. Dr. Nakasone found that it was probably Tamara, and probably not Tanya, who called the American National Bank regarding a separate wire, and probably Tanya, and probably not Tamara, who made another call to a New Jersey bank.

Smith challenges the district court's admission of this evidence against her on two grounds: the lack of general acceptance of spectrograms by the scientific community, and the fact that she had no opportunity to cross-examine the police detective who prepared the spectrograms used at trial. The government disputes these contentions.

■ In discussing the admissibility of this evidence in general, both parties cite *Frye v. United States*, 293 F. 1013 (D.C. Cir.1923) in which the court stated that:

> Just when a scientific principle or discovery crosses a line between experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential forces of a principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction must be made must be sufficiently established to have

---

1. Several witnesses made mistaken identifications as between the twins.

2. The grand jury originally indicted Smith on April 8, 1986, and returned a superseding indictment containing essentially the same charges on May 13, 1986.

gained general acceptance in a particular field in which it belongs.

*Id.* at 1014.

Although the validity of the judge-made rule in *Frye* has been criticized by some courts and commentators for numerous reasons, this circuit has continued to affirm (and to apply) the *Frye* standard. *United States v. Carmel,* 801 F.2d 997, 999 (7th Cir.1986); *United States v. Tranowski,* 659 F.2d 750, 755–56 (7th Cir.1981). Under the *Frye* test, several other circuits have held expert testimony concerning spectrographic voice identification admissible. *See, e.g., United States v. Williams,* 583 F.2d 1194, 1198–1201 (2d Cir.1978), *cert. denied,* 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979); *United States v. Baller,* 519 F.2d 463, 465–67 (4th Cir.), *cert. denied,* 423 U.S. 1019, 96 S.Ct. 456, 46 L.Ed.2d 391 (1975); *United States v. Franks,* 511 F.2d 25, 32–34 (6th Cir.), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 693 (1975).[3] We join these circuits today, and hold that expert testimony concerning spectrographic voice analysis is admissible in cases where the proponent of this testimony has established a proper foundation.

### A. *General Considerations*

With respect to admission of expert testimony in general, Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Under this rule, trial courts have broad discretion to admit or exclude evidence, and their rulings will not be reversed absent an abuse of that discretion. *See, e.g., Simplex, Inc. v. Diversified Energy Sys., Inc.,* 847 F.2d 1290, 1292 (7th Cir.1988) (decision of trial court is to be affirmed unless "manifestly erroneous"); *United States v. Lundy,* 809 F.2d 392, 394–95 (7th Cir.1987) (same); *United States v. Davis,* 772 F.2d 1339, 1343–44 (7th Cir.), *cert. denied,* 474 U.S. 1036, 106 S.Ct. 603, 88 L.Ed.2d 581 (1985); *United States v. Watson,* 587 F.2d 365, 369 (7th Cir.1978), *cert. denied,* 439 U.S. 1132, 99 S.Ct. 1055, 59 L.Ed.2d 95 (1979). In *Lundy,* this court summed up many of the predicates for admission of expert testimony when it said:

> Because experts are given special latitude to testify based on hearsay and third-hand observations and to give opinions, *see* Fed.R.Evid. 702, courts have cautioned that an expert must be qualified as an expert, provide testimony that will assist the jury and rely only on evidence on which a reasonable expert in the field would rely.... Courts agree that it is improper to permit an expert to testify regarding facts that people of common understanding can easily comprehend.

809 F.2d at 395 (citations omitted).

In discussing whether expert testimony concerning spectrographic voice identification in particular is admissible under *Frye,* other circuits seem to have focused upon whether the technique is (a) reliable and (b) likely to mislead the jury. *Williams,* 583 F.2d at 1198–1200.[4]

---

3. Only one circuit so far has held that testimony on spectrographic voice identification is inadmissible. *United States v. Addison,* 498 F.2d 741 (D.C.Cir.1974). Even then, the District of Columbia Circuit was led to question its decision two years later. *See United States v. McDaniel,* 538 F.2d 408, 413 (D.C.Cir.1976) (although the court acknowledged that it might be time to reexamine *Addison* in light of increased reliability and general acceptance of spectrograms, it felt constrained by precedent and would not do so except *en banc* ).

4. In *Williams,* the Second Circuit noted that probativeness and materiality also were relevant

avenues of inquiry. It also acknowledged, however, that in a case like this, these considerations present little difficulty. "If the 'unknown' voice be established as having been employed in the commission of, or in relation to, the crime alleged, *i.e.,* a proper foundation has been laid, evidence that the voice is that of the accused is both probative and material." 583 F.2d at 1198.

All of these considerations are, of course, relevant in determining the admissibility of other types of expert testimony on witness identification. *See United States v. Watson,* 587 F.2d at 368–69 (expert testimony on reliability of cross-racial eyewitness identification properly exclud-

Regarding the reliability of such evidence, we make the observation made by other circuits that:

[N]either newness nor lack of absolute certainty in a test suffices to render it inadmissible in court. Every useful new development must have its first day in court. And court records are full of the conflicting opinions of doctors, engineers and accountants....

*United States v. Stifel,* 433 F.2d 431, 437 (6th Cir.1970), *cert. denied,* 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 531 (1971); *Franks,* 511 F.2d at 33. Unanimity of opinion is not necessary among the scientific community to deem evidence reliable. *Baller,* 519 F.2d at 466; *Williams,* 583 F.2d at 1198 ("A determination of reliability cannot rest solely on a process of 'counting (scientific) noses.' "). The technique, moreover, need not be infallible to be reliable. *Williams,* 583 F.2d at 1198.

In *Williams,* the court noted several indicia of reliability of a given scientific technique. They include the potential rate of error, the existence and maintenance of standards, the care and concern with which a scientific technique has been employed (and whether it appears to lend itself to abuse), and its analogous relationship with other types of scientific techniques. A final factor is the presence of "fail-safe" characteristics: characteristics the variability of which will lead to different, rather than similar, results. 583 F.2d at 1198–99. The court in *Williams* opined that these indicia were present with regard to spectrograms.

The tendency of testimony on scientific techniques to mislead the jury relates to the fact that, because of the apparent objectivity of opinions with a scientific basis, the jury may cloak such evidence in an "aura of mystic infallibility." *Williams,* 583 F.2d at 1199; *Baller,* 519 F.2d at 466. In other words, the jury may give this testimony more weight than it is due. The tendency of such evidence to mislead the jury is reduced, however, by factors such as the comprehensibility of the technique, the ability of the jury to make the same comparisons as the expert, and the instruction of the jury by the trial judge as to their responsibility to discredit such evidence if they find it unconvincing. The weight of such testimony can be attacked, moreover, by cross-examination and refutation. *Williams,* 583 F.2d at 1199–1200; *Baller,* 519 F.2d at 466–67; *Franks,* 511 F.2d at 32–34.

## B. *Admissibility in This Case*

■ Smith's principal argument is that spectrographic voice identification has not received sufficient general acceptance in the scientific community to be admissible under *Frye.*[5] She contends that in cases where courts have admitted voice identification testimony, these courts have too narrowly defined the relevant scientific community to include only those scientists who use the technique, and not those who oppose its use. The relevant scientific community includes not only those who utilize spectrographic voice identification techniques,[6] but linguists, psychologists and engineers as well.

ed because the testimony would have been of little use to the jury, and because of the inadequacy of work in the field).

**5.** Smith also seems to argue that this evidence does not assist the jury in determining identity. She asserts that this is so, however, because this evidence flunks the *Frye* test: "Failing to meet [the *Frye* ] standard, such evidence is unreliable and of little probative value. More precisely, spectrographic evidence does not assist the jury to determine the issue of identity and thus does not fall within the parameters of Federal Rule of Evidence 702." Although Smith criticizes the district court for admitting Nakasone's testimony where he never before had been qualified as a voice identification expert in a court of law,

this argument seems to be rolled into her *Frye* argument, and not a separate argument that Nakasone was not a qualified expert.

**6.** Smith also argues, in her reply brief, that use of voice identification testimony is suspect because a relatively small group of individuals give this testimony in court and also have formed their own organization, the International Association for Voice Identification (IAVI). Thus, Smith contends, the members not only "[give] out credentials to alleged experts," but cite one another to support their theory that this procedure is generally accepted in the scientific community. (Appellant's Reply Brief at 14.)

Smith also cites a 1979 report of the National Research Council, *On the Theory and Practice of Voice Identification*, saying that there is a wide disparity in this field between the development of the theories behind voice identification and its practice, the latter being more developed than the former.[7] She also criticizes the fact that Nakasone, who never before had been qualified as a voice identification expert in a court of law, was allowed to testify.[8] Smith also seizes on the fact that Nakasone admitted in his testimony that the field itself was controversial and that some studies had found high error rates. She acknowledges *Williams* and *Stifel*, discussed above, which advocate a flexible approach to applying the *Frye* test, but urges that "it is equally true that a scientific procedure must be accepted and proved reliable before it is brought into a courtroom lest the integrity of the judicial process succumb to charlatans and quacks."

As the government points out in its brief, Smith misconceives the manner in which the *Frye* test is to be applied. Under her view, it would seem, if there is any disagreement at all as to the reliability or validity of a scientific technique, the disputed evidence should not come in. This court has not applied the *Frye* test in such a manner. Polygraph (lie detector) test results long have been admissible in this circuit under the sound discretion of the trial judge, provided that this discretion is not abused. *See, e.g., United States v. Williams*, 737 F.2d 594, 610–11 (7th Cir. 1984), *cert. denied*, 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985); *United States v. Feldman*, 711 F.2d 758, 767 (7th Cir.), *cert. denied*, 464 U.S. 939, 104 S.Ct. 352, 78 L.Ed.2d 317 (1983); *United States v.*

*Black*, 684 F.2d 481, 483 (7th Cir.), *cert. denied*, 459 U.S. 1043, 103 S.Ct. 463, 74 L.Ed.2d 613 (1982); *United States v. Rumell*, 642 F.2d 213, 215 (7th Cir.1981). Polygraph tests are still of disputed reliability.

Turning finally to the instant case, we hold that the district judge did not abuse his discretion in admitting the testimony. Sufficient evidence of the reliability of this technique was adduced at trial. Moreover, this technique is not, under the proper circumstances, likely to mislead the jury. We hold that such circumstances existed here.

The government presented ample evidence of the reliability of spectrographic voice identification at trial. In addition to describing the principles behind and the technique used to make spectrograms,[9] Dr. Nakasone testified as to their reliability. He himself had performed spectrographic analysis and produced his own opinion thereon in 150 instances, even though he never before had testified as a voice identification expert in a court of law. In none of these cases had he been informed that he had made a misidentification.

Nakasone also testified as to studies performed in the field. He first discussed a study performed by Professor Oscar Tosi of Michigan State University in conjunction with the Michigan State Police from 1968 to 1970. Of the 35,000 comparisons made in this study, the error rate for false identifications was 2.4% and the error rate for false eliminations was about 6%. This study previously has been cited as authoritative by other federal courts of appeal. *See, e.g., Williams*, 583 F.2d at 1198; *Baller*, 519 F.2d at 465. A follow-up to that study conducted by Dr. Tosi involving only

---

**7.** As the government points out in its brief, the committee preparing the study took no position on whether this evidence should be admissible, but stated that if it is, its limitations should be explained to the judge and jury.

**8.** Nakasone had testified previously in a case where he was qualified in the area of speech recognition.

**9.** A spectrogram is, according to Dr. Nakasone, a graphic display of sound in three dimensions: frequency in hertz, time in seconds and differ-

ent levels of energy. Spectrograms display the fundamental frequency (pitch) of a voice and its resonating characteristics, as well as rate of speech. Different formations of words result in different patterns on the spectrogram. Spectrograms are made by transferring a recorded voice to a machine, called a sound spectrograph, that transforms the sounds on tape into electrical coordinates. These coordinates manifest themselves as different shadings on paper. For another description of this process, see *Williams*, 583 F.2d at 1197.

actual cases examined by trained voice examiners found no errors whatsoever.[10]

Nakasone also discussed a more recent report published by the FBI in June, 1987 in the Journal of the Acoustical Society of America. The cases in that report which were submitted to actual determinations yielded a .31% rate of false identifications and a .53% rate of false eliminations. Finally, Nakasone testified that variations, such as use of tapes not recorded under laboratory conditions and attempts by the speaker to disguise her voice, will increase the error rate of false eliminations. That is, instead of resulting in more false identifications, these variations will result in more false eliminations.

On cross-examination as to his qualifications, Dr. Nakasone readily admitted that no one's voice is one-hundred percent unique, and that the field of voice identification is not one-hundred percent reliable. He also indicated his awareness of other studies, the Campbell study and the Hazzen study. These studies had higher error rates than those cited by him, purportedly of 62.7 percent and 83.33 percent respectively.[11] Nakasone also mentioned that no studies involving black females, which both of the defendants are, had been performed.

During subsequent cross-examination, Nakasone answered questions regarding the study performed by the National Research Council cited to by Smith in her brief. He also testified extensively as to intraspeaker and interspeaker variation. Nakasone agreed that no one says the same word exactly the same way twice and that it is currently only an assumption that interspeaker variation is sufficiently greater than intraspeaker variation for spectrographic analysis to be able to distinguish one person's voice from that of another.[12]

We conclude that the district judge did not abuse his discretion in admitting Nakasone's testimony into evidence. This testimony contained many of the indicia of reliability discussed by the Second Circuit in *Williams, supra*. A thorough examination of the record reveals both that this technique is not one-hundred percent infallible and that the entire scientific community does not support it. As we discuss above, however, neither infallibility nor unanimity is a precondition for general acceptance of scientific evidence under *Frye*. We also note, as the government points out in its brief, that spectrographic identification is similar to lay identification of voices, which is admissible in this circuit. *See, e.g., United States v. Gironda*, 758 F.2d 1201, 1218 (7th Cir.), *cert. denied*, 474 U.S. 1004, 106 S.Ct. 523, 88 L.Ed.2d 456 (1985).

Since sufficient indicia of reliability were present in this case, it was proper for the district judge to let this evidence go to the jury, in order for it to make the ultimate determination as to the credibility of Nakasone's testimony. *Williams*, 583 F.2d at 1200.

This testimony, moreover, was not likely to mislead the jury. The jury had the opportunity in this case to hear both the voice exemplars and the recorded conversations, and to see the spectrograms. Although the district judge did not give a specific instruction on Nakasone's testimony, he properly instructed the jury as to their sole prerogative to judge credibility of the witnesses and the weight of their testimony, and as to their right to reject expert testimony. Dr. Nakasone, moveover, was very candid at trial about the limitations of spectrography. He also was subject to rigorous cross-examination. As we discuss below, it was not necessary that Smrkovski, who prepared the spectrograms, be

10. Smith is correct that the National Research Council study, to which she cites in her brief, was performed after the Tosi study. She does not demonstrate, however, how this makes the first study *per se* unreliable.

11. Nakasone discredits these studies during further direct examination on the grounds that one study did not use sufficiently well trained voice examiners or sufficient samples, and that the other study did not sufficiently duplicate actual conditions.

12. Nakasone also testified, however, that Tamara and Tanya Smith exhibited consistent interspeaker variation, thus eliminating some of the difficulty presented in the abstract.

cross-examined. We thus conclude that this testimony was admissible.

### C. *Right to Confrontation*

█ Smith argues that Dr. Nakasone's testimony should not have been admitted into evidence because it was based upon the spectrograms created by the government's intended witness who was unable to testify, Lieutenant Smrkovski. This, Smith contends, deprived her of her right to confrontation because she could not cross-examine Smrkovski. We find this position to be without merit. The only opinion offered in this case was that of Dr. Nakasone. It is true that Lieutenant Smrkovski prepared the spectrograms examined by Nakasone, but it is well settled that expert witnesses may rely on material commonly used by others in the field, even if those materials were prepared by others. *See* Fed.R.Evid. 703; *Lundy,* 809 F.2d at 395; *United States v. Lawson,* 653 F.2d 299, 301–03 (7th Cir.1981), *cert. denied,* 454 U.S. 1150, 102 S.Ct. 1017, 71 L.Ed.2d 305 (1982); *Baumholser v. Amax Coal Co.,* 630 F.2d 550, 552–53 (7th Cir.1980).

The confrontation clause of the sixth amendment to the Constitution does not forbid reliance at trial by experts upon material prepared by others. It requires, however, that the defendant have access to such material, in order that she has an adequate opportunity to prepare her cross-examination. *Lawson,* 653 F.2d at 302–03. Here, Smith had access to the spectrograms and recordings used by Dr. Nakasone in forming his opinion. Hence, Tamara Smith's right to confrontation was not violated. It is, of course, true that an expert witness may not simply summarize the out-of-court statements of others as his testimony. *Id.* That is not, however, what Dr. Nakasone did in this case. He was not, as Smith contends, merely an "understudy" for Lieutenant Smrkovski.[13]

### III. Severance

█ The day before trial, Smith moved to sever her trial from that of her sister on the ground that her testimony could exculpate Tanya. The district court denied the motion. She renewed this motion before trial, but did not renew it thereafter. On appeal she argues that the district judge should have granted her motion because the evidence in this case was so voluminous and complex that it was impossible for the jury to separate the evidence as it relates to each defendant's innocence or guilt. Smith also contends that she was prejudiced by the confusion at trial as to which defendant was which.

We affirm the district court's denial of the motion to sever. "The general rule is that persons jointly indicted together should be tried together, especially in conspiracy cases." *United States v. Giangrosso,* 779 F.2d 376, 379 (7th Cir.1985), *cert. denied,* 475 U.S. 1031, 106 S.Ct. 1237, 89 L.Ed.2d 345 (1986) (quoting *United States v. Madison,* 689 F.2d 1300, 1305 (7th Cir. 1982), *cert. denied,* 459 U.S. 1117, 103 S.Ct. 754, 74 L.Ed.2d 971 (1983)). We also note that the trial judge's decision on a motion for severance only will be overturned upon a showing of abuse of discretion. *United States v. Ogelsby,* 764 F.2d 1273, 1275 (7th Cir.1985).

█ An appellate court reviewing the denial of a motion for severance will evaluate the record only as of the time the motion was made. *Oglesby,* 764 F.2d at 1275; *United States v. Oxford,* 735 F.2d 276, 279 (7th Cir.1984); *United States v. Pacente,* 503 F.2d 543, 546 (7th Cir.), *cert. denied,* 419 U.S. 1048, 95 S.Ct. 623, 42 L.Ed.2d 642 (1974). For this reason, Smith cannot raise arguments on the inability of the jury to separate the evidence as it relates to her and to her sister. None of the events at trial of which she complains in her brief had occurred at the time Smith made her motion; that is, before trial.

---

**13.** Nakasone based his testimony at trial on his own analysis of the spectrograms prepared by Smrkovski. Although Nakasone reportedly agreed with Smrkovski's conclusions, Smrkov-

ski did not indicate the confidence level of his findings. Nakasone's testimony at trial included the degree of confidence of his identifications and eliminations.

 Smith also cannot argue on appeal that she was prejudiced by the jury's alleged inability to separate the evidence and the confusion at trial as to identity for another reason. This is because she did not raise these arguments at trial. Hence, she is precluded from raising them on appeal absent a showing of plain error. *See, e.g.,* Fed.R.Crim.P. 52(b); *United States v. Fuesting,* 845 F.2d 664, 670 (7th Cir.1988); *United States v. Whaley,* 830 F.2d 1469, 1476 (7th Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988); *United States v. Sblendorio,* 830 F.2d 1382, 1396 (7th Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 1034, 98 L.Ed.2d 998 (1988). For there to be plain error, there must have been a "miscarriage of justice." *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985); *Whaley,* 830 F.2d at 1476; *Sblendorio,* 830 F.2d at 1396. This term "implies the conviction of one who but for the error probably would have been acquitted." *United States v. Silverstein,* 732 F.2d 1338, 1349 (7th Cir.1984), *cert. denied,* 469 U.S. 1111, 105 S.Ct. 792, 83 L.Ed.2d 785 (1985). We do not find that such error occurred here. The fact that the jury acquitted Tamara (but not Tanya) of six of the counts in the indictment indicates that the jury was in fact able to consider separately the evidence as it relates to each defendant. *United States v. Buishas,* 791 F.2d 1310, 1314–15 (7th Cir.1986).

### IV. Grand Jury

 Tamara Smith was indicted in the Northern District of Illinois by the Special October, 1984 grand jury. It subsequently was discovered that the records of the clerk's office did not contain a written order extending that grand jury's term. Smith claims that because no order extending the term of the grand jury was filed, the grand jury itself was not properly constituted and thus her indictment was invalid.

This court has resolved the "grand jury issue" raised in this case. In *United States v. Taylor,* 841 F.2d 1300 (7th Cir.), *cert. denied,* — U.S. ——, 108 S.Ct. 2904, 101 L.Ed.2d 937 (1988), we explicitly reject-ed that argument and ruled that "the Special October, 1984 Grand Jury [for the Northern District of Illinois] was validly extended until 24 months from the date of its impanelment." *Id.,* at 1309. The *Taylor* case could not more directly address and resolve Smith's claim. Since the Special October, 1984 grand jury was validly extended, it was properly constituted at the time of Smith's indictment. *Id.* Thus, Smith's indictment was valid.

### IV. Conclusion

The admission in this case by the judge of the testimony of a spectrographic voice identification expert was not an abuse of his discretion. The district judge's denial of Tamara Smith's motion to sever her trial from that of her sister also was not an abuse of discretion. Finally, the grand jury indicting Tamara Jo Smith was properly constituted.

AFFIRMED.