King, J.
Tbe above captioned action is a medical malpractice action where the plaintiffs, Danielle LaSalvia, ppa Sonya Harrison, Sonya Harrison, and David J. LaSalvia, allege that the defendants, Cynthia Johnson, M.D. and Vanessa Barss, M.D. failed to adhere to the standard of care applicable in 1992 by not administering the antenatal steroid Betamethasone to Ms. Harrison on a weekly basis for the purpose of advancing fetal lung maturity. In addition, the plaintiffs allege that Sheronette Cousins, M.D. and Sibel Bessim, M.D. deviated from the applicable standard of care in 1992 by failing to use a different tocolytic agent when the prescribed Terbutaline failed to stop Ms. Harrison’s labor. The defendants filed a motion, pursuant to Daubert v. Merrill Dow Pharmaceuticals,[3] to preclude the plaintiffs’ experts from testifying at trial that the defendants deviated from the standard of care in 1992 and that if they had adhered to the applicable standard, Danielle’s medical outcome would have been improved.[4] The court held an evidentiary hearing on December 2, 2002 and heard oral arguments on December 3, 2002. At the conclusion of the hearing, the court allowed the Daubert motion in part and denied it in part. While the *623 court finds Dr. McDonough, the plaintiffs’ expert, qualified to opine as to the standard of care in 1992, the court finds that Dr. McDonough’s opinion, that the defendants’ failure to adhere to the applicable standard of care was a proximate cause of the plaintiffs’ injuries, has no scientific basis. For this reason, the defendants’ motion to exclude the testimony of the plaintiffs’ expert on the issue of causation will be allowed.
FINDINGS OF FACT
On June 12, 1992, Sonya Harrison (“Ms. Harrison”) was 27½ weeks pregnant. After experiencing cramping and vaginal spotting, Ms. Harrison was admitted to Brigham & Women’s Hospital with an initial diagnosis of premature contractions and dilated cervix. Once admitted, Cynthia Johnson, M.D. (“Dr. Johnson”) ordered one course of the antenatal steroid Betamethasone, consisting of two doses, and also ordered doses of Terbutaline eveiy six hours.[5] Dr. Johnson, an obstetrician, consulted with Vanessa Barss, M.D. (“Dr. Barss”), a maternal fetal medicine specialist.[6] From June 12 through June 20, 1992, Ms. Harrison experienced intermittent contractions and the dosage of Terbutaline was increased to every four hours.
On June 20, 1992, Dr. Sheronette Cousins (“Dr. Cousins”) transferred Ms. Harrison to Labor and Delivery due to increased contractions. While in Labor and Delivery, Sibel Bessim, M.D. (“Dr. Bessim”) ordered Terbutaline injections, which decreased the contractions to every twenty minutes, and Ms. Harrison was returned to the antenatal floor. On June 21, 1992, Drs. Cousins and Bessim delivered Danielle LaSalvia (“Danielle”) via cesarean section, due to breech presentation. Danielle was initially intubated for less than twenty-four hours, extubated, and weaned to room air. Danielle spent the first eight weeks of her life in the hospital. Today, Danielle suffers from cerebral palsy and other medical problems.[7]
The plaintiffs filed this medical malpractice action against the defendants on September 18, 1996. The plaintiffs seek to introduce expert testimony as to the defendants’ failure to adhere to the standard of care applicable in 1992 in two ways: first, that the applicable standard of care required additional weekly courses of Betamethasone to pregnant women in preterm labor; second, that the applicable standard of care required the administration of a second tocolytic agent when the first tocolytic agent failed to stop the premature labor. The plaintiffs claim that had the standard been followed, by administering additional weekly courses of Betamethasone, Danielle’s lungs would have been better prepared for her premature birth and that the administration of other tocolytic agents, when Terbutaline failed to stop Ms. Harrison’s labor, would have extended gestation and improved Danielle’s medical outcome.
At the evidentiary hearing, the plaintiffs offered the testimony of Edward T. McDonough Jr., M.D. (“Dr. McDonough”). The preliminary issue was whether Dr. McDonough was qualified to offer his medical opinion as to the applicable standard of care in 1992. Dr. McDonough has a license from the National Board of Medical Examiners in the areas of obstetrics and gynecology, and he is also certified by the American Board of Obstetrics and Gynecology. Throughout his career as an obstetrician/gynecologist, Dr. McDonough has delivered approximately 7,000 babies. He has been an attending physician in the departments of obstetrics and gynecology at several hospitals throughout the northeast. In addition, Dr. McDonough has held several faculty positions. He is a member of various medical societies and has served on several medical committees. Based on his background and experience, Dr. McDonough is qualified to opine as to the 1992 standard of care, and to the defendants’ breach of that standard of care, namely, that the defendants breached the duty of care owed to the plaintiffs in 1992 by failing to give additional weekly doses of antenatal steroids coupled with other tocolytic agents.[8]
Both sides furnished the court with numerous medical studies relevant to the causation issue. “Statements of facts or opinions on a subject of science or art contained in a published treatise, periodical... shall, in so far as the court shall find that the said statements are relevant and that the writer of such statements is recognized in his profession or calling as an expert on the subject, be admissible in actions ... for malpractice ... against physicians ... as evidence tending to prove said facts or as opinion evidence . . .” G.L.c. 233, §79C. It is undisputed that the materials and literature submitted by the parties at the Daubert hearing were admissible under G.L.c. 233, §79C.
The court now turns to the issue of whether Dr. McDonough’s opinion, that the failure to comply with the applicable standard of care caused harm to Danielle, is reliable, i.e., supported by the appropriate validation. Daubert, 509 U.S. at 590. After considering the evidence and arguments of counsel and reviewing the studies and articles submitted, the court finds that there is no reliable scientific basis to support Dr. McDonough’s opinion that the defendants’ failure to comply with the applicable standard of care, as defined by Dr. McDonough, caused damage to Danielle. The overwhelming scientific evidence submitted to the court establishes that the failure to administer additional drugs caused no harm to the plaintiffs.
In assessing whether a theory or technique is scientific knowledge that will assist the trier of fact, an important question to answer is if the theory can be or has been tested. Daubert, 509 U.S. at 593. “Scientific Methodology today is based on generating hypotheses and testing them to see if they can be falsified.” Id., quoting Green & Nesson, Problems, Cases and Materials on Evidence at 645 (1983). The scientific method is the process by which scientists collectively, and over time, attempt to create an accurate (that is, reliable, consistent *624 and non-arbitrary) representation of the world. Wilson, An Introduction to Scientific Research, McGraw-Hill (1952); Kuhn, The Structure of Scientific Revolutions, Univ. of Chicago Press (1962); Barrow, Theories of Everything, Oxford Univ. Press (1991). The scientific method consists of the following steps: observation and the collection of data; hypothesis and the formation of possible explanations of the data; experimentation to test the hypothesis; and interpretation of the results and drawing conclusions based on the findings.
Experimentation is absolutely critical in verifying hypothetical predictions. Wilson, An Introduction to Scientific Research, McCgraw-Hill (1952); Kuhn, The Structure of Scientific Revolutions, Univ. of Chicago Press (1962); Barrow, Theories of Everything, Oxford Univ. Press (1991). In addition, “the statements constituting a scientific explanation must be capable of empirical tests.” Daubert, 509 U.S. at 593, quoting C. Hempel, Philosophy of Natural Science 49 (1966). Another important factor in assessing a particular scientific technique or theory, is the court’s consideration of the known or potential rate of error. Id. at 594, citing United States v. Smith, 869 F.2d 348, 353-54 (7th Cir. 1989). Further, the court should contemplate the existence and maintenance of standards controlling the technique’s operation. Id., citing United States v. Williams, 583 F.2d 1194, 1198 (2nd Cir. 1978).
Dr. McDonough agreed that a randomized, controlled, double-blind study to be the most ideal way of conducting scientific experimentation. Control groups are used to compare an experimental group in a test of a causal hypothesis. The control and experimental groups must be identical in all relevant ways except for the introduction of a suspected causal agent into the experimental group. A random test is one which randomly assigns items to the control or experimental groups. A double-blind test is a control group test where neither the evaluator of the experiment nor the subjects know which items are controls. The purpose of controls, double-blind and random testing is to reduce error, self-deception and bias. This type of study is most reliable because a clear comparison and conclusion based on the results is obtained. Dr. McDonough’s opinion is based on medical literature and his own experiences. None of the literature he relied on involved scientifically based studies because none were performed using a random controlled group. These types of studies are not scientifically reliable because there is no way of knowing the medical outcomes of women who did not receive additional courses of Betamethasone or combined tocolytic therapy. In addition, as to Dr. McDonough’s own patients, he could not comment as to how his patients would have faired had they not received additional courses of antenatal steroids and tocolytic agents. Dr. McDonough acknowledged that before he began to administer steroids and tocolytic agents, some of his patients in premature labor delivered at full-term simply with bed rest and no additional drug therapy.
I. Antenatal Steroids — Betamethasone
The plaintiffs seek to introduce expert evidence that the use and benefit of additional weekly courses of Betamethasone would have improved Danielle’s medical outcome by increasing the development of her lungs. When a women is in preterm labor, various treatments are utilized in an attempt to halt labor. One such treatment is administering tocolytics coupled with antenatal steroids, such as Betamethasone, in an attempt to mature the fetal lungs. In 1972, Liggins and Howie first described the benefits of antenatal steroid treatment for fetal lung maturity in women threatened with preterm labor. Liggins et al., A Controlled Trial of Antepartum Glucocorticoid Treatment for Prevention of the Respiratory Distress Syndrome in Premature Infants, Pediatrics, Vol. 50 No. 4, October 1972, pp. 515-25.
Although the court found Dr. McDonough qualified to opine that the standard of care applicable in 1992 was to administer additional weekly doses of steroids, the court finds no scientific basis for the plaintiffs’ claim that a more favorable outcome for Danielle would have resulted if additional doses were administered. Multiple randomized and controlled trials, since the Liggins and Howie study, have established the benefit of only one course of antenatal steroids which consists of two doses of Betamethasone given twenty-four hours apart. Block et al., Antenatal Glucocorticoid Therapy for the Prevention of Respiratory Distress Syndrome in the Premature Infant, Obstetrics and Gynecology, Vol. 50 No. 2 August 1977, pp. 186-90. The court notes additional studies submitted by the defendants that further question and express concern over the long-term effects upon the fetus and mother after successive uses of antenatal steroids. Doran et al., Results of a Double-Blind Controlled Study on the Use of Betamethasone in the Prevention of Respiratory Distress Syndrome, Am J. of Obstetrics and Gynecology, Vol. 136 No.3, February 1, 1980, p. 319.
One particular study, submitted by the defendants, was a double-blind, placebo-controlled study, conducted on women at risk for preterm delivery between 1996 and 2000. The explicit objective of this study was to determine the effectiveness of reducing the incidence of neonatal morbidity beyond that achieved with single course steroid therapy, and to evaluate potential morbidity with weekly courses of antenatal steroids. Defendant’s Exhibit No. 4: Guinn et al., Single vs Weekly Courses of Antenatal Corticosteroids for Women at Risk of Preterm Delivery: A Randomized Controlled Trial, The Journal of the American Medical Association (“JAMA”), October 3, 2001, p. 12. At the time of this study, no published randomized trial had established the safety or effectiveness of single versus weekly courses of antenatal steroids. The conclusion reached was that weekly courses of antenatal steroids did not reduce composite neonatal morbidity compared with a single course of treatment. Furthermore, the trial was halted prema *625 turely because of the potential for long-and short-term damage resulting from weekly administrations.
Due to the variable use of steroids, the National Institute of Health (“NIH”) convened a Consensus Development Conference on the Effect of Corticosteroids for Fetal Maturation and Perinatal Outcomes in 1994. The consensus panel recommended that, due to insufficient scientific evidence, repeat corticosteroid courses should not be routinely used but should be reserved for women enrolled in clinical trials. 1994 NIH Consensus Conference: Effect of Corticosteroids for Fetal Maturation on Perinatal Outcomes, JAMA, February 1, 1995, p. 413. The data is not adequate “to establish a clinical benefit beyond 7 days after antenatal corticosteroid therapy.” Id . at 416. The panel also identified areas that required additional research, including “short-and long-term benefits and risks of repeating administration of antenatal corticosteroids 7 days after the initial course.” Id. at 417.
II. Tocolytic Agents
The plaintiffs also seek to offer expert testimony that had a different tocolytic agent been administered to Ms. Harrison after Terbutaline failed to stop her labor, this treatment would have extended Danielle’s gestation and resulted in an improved medical outcome. Again, Dr. McDonough’s opinion as to causation is not scientifically supported.
The court finds Dr. McDonough qualified to opine that the standard of care in 1992 required administering alternative tocolytic agents if Terbutaline failed to halt preterm labor. However, based on all the evidence, the court finds that the randomized, controlled studies demonstrate that Dr. McDonough’s opinion lacks scientific validity. None of the literature cited by the plaintiffs in support of their position involves random, controlled studies.
One article, submitted by the defendants, is a summary of eighteen randomized controlled trials that examined the efficacy of any tocolytic agent compared with a placebo or no tocolytic agent, for women in preterm labor. Gyetvai et al., Tocolytics for Preterm Labor: A Systematic Review, Obstetrics & Gynecology: Sunnybrook and Women’s College Health Sciences Centre, Vol. 94, No. 5, Part 2, November 1999. The review concluded that while tocolytics prolonged labor, they have not been shown in the eighteen studies to improve neonatal outcomes. Dr. McDonough testified that he would not fault obstetricians who relied upon these types of studies and conclusions in their practice of medicine. In addition to this article, there are numerous random, controlled, double-blind studies that have concluded that there is no efficacy in repeat administrations of tocolytic agents and that these tocolytic agents do not delay labor for any significant amount of time. Norwitz et al., The Control of Labor, The New England Journal of Medicine, Vol. 341, No. 9, August 26, 1999, pp. 660-64; The Canadian Preterm Labor Investigators Group, Treatment of Preterm Labor with, the Beta-Adrenergic Agonist Ritodrine, The New England Journal of Medicine, Vol. 327, No. 5, July 30, 1992, pp. 308-12. A study in a 1999 volume of The New England Journal of Medicine stated that “there [is] no reliable data to suggest that any [tocolytic agent] delay[s] delivery for more than 48 hours.” Norwitz et al., The New England Journal of Medicine, p. 663. In this case, Ms. Harrison’s labor was delayed for nine days after Terbutaline was administered.
RULINGS OF LAW
A party offering scientific testimony beyond the basic understanding of a lay jury, must provide expert testimony that establishes the theory’s validity. 432 Mass. 304, 316 (2000). Understanding medical causation that is “beyond the... knowledge of the ordinary layman ... proof of it must rest upon expert medical testimony.” Canavan’s Case, 432 Mass. at 316, quoting, Hachadourian’s Case, 340 Mass. 81, 85 (1959). In these types of cases, the judge plays a “gatekeeper role” in determining whether the process or theory underlying a scientific expert’s opinion lacks reliability. Commonwealth v. Lanigan, 419 Mass. 15, 26 (1994). The judge’s role is critical in preventing confusion among the layjury, especially when presented with complex and conflicting theories. The judge engages in a preliminary assessment of the scientific truth and the applicability of the methodology to the facts at issue. Daubert, 509 U.S. at 592-93. In Daubed the Supreme Court adopted Rule 702 of the Federal Rules of Evidence: “If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine the fact in issue, a witness qualified as an expert . . . may testify thereto.” 509 U.S. at 589, quoting Fed. R. Evid. 702. The Supreme Judicial Court noted that this rule is also the same as Rule 702 of the Massachusetts Proposed Rules of Evidence. Lanigan, 419 Mass. at 25. Opinions regarding medical causation are classic examples of testimony that must be subject to Lanigan analysis. Canavan’s Case, 432 Mass. at 316. If the process or theory underlying the expert’s opinion is unreliable, “that opinion should not reach the trier of fact.” Id. at 26. Daubed suggests that the inquiry envisioned for assessing the validity of scientific evidence is “a flexible one.” 509 U.S. at 594. The court noted that the focus “must solely be on principles and methodology, not on the conclusions that they generate.” Id. at 595.
The Supreme Judicial Court found the Daubed decision consistent with its test of demonstrated reliability. Lanigan, 419 Mass. at 26. The Lanigan court adopted in part the Supreme Court’s reasoning in Daubed and held that a proponent of scientific opinion evidence may demonstrate the reliability or validity of the underlying scientific theory or process by some other means, that is, without establishing general acceptance. 418 Mass. at 26. The court, however, added that in most cases general acceptance will be the significant and “often the only” issue. Id. Conclusions based on personal observation and clinical experiences are to be subjected to Lanigan analysis. Canavan’s Case, 432 Mass. at 313. *626 The purpose of the tests proposed in Daubert and Lanigan is to prevent experts from giving testimony that is not based on reliable methodology. Personal experiences or observations are admissible only if the proponent can “show that the method of personal observation is either generally accepted by the relevant scientific community or otherwise reliable to support scientific conclusions relevant to the case.” Id. at 314. Establishing the reliability of personal observations, however, may in some circumstances necessitate examination of other areas. Id., n. 5.
In conclusion, the court assumes its role of gatekeeper and precludes plaintiffs’ expert testimony on the issue of causation. While the court accepts that Dr. McDonough is qualified to opine as to the applicable standard of care, the court concludes that there is no reliable scientific support for his opinion as to causation. Rather, the reliable scientific studies, that is those conducted using randomized, double-blind, control groups, clearly demonstrate that there is no scientific basis for concluding that the failure to provide additional weekly doses of antenatal steroids and other tocolytic agents caused injury to the plaintiffs.
ORDER
For the foregoing reasons, it is hereby ORDERED that the Defendants’ Motion to Preclude Testimony of Plaintiffs’ Experts, pursuant to Daubert v. Merrill Dow Pharmaceuticals, is ALLOWED as to experts’ opinion regarding causation and DENIED as to experts’ opinion concerning negligence.

509 U.S. 579 (1993).

The defendants also filed a Motion for Summary Judgment which alleges that the statute of limitations period had run on Sonya Harrison and David J. LaSalvia’s loss of consortium and negligent infliction of emotional distress claims. The court finds it unnecessary to address the defendants’ summary judgment motion because the court’s allowance of the Daubert motion is, as a practical matter, dispositive of the case because the plaintiffs will be unable to introduce expert evidence showing a causal relationship between any negligence of the defendant doctors and injury to the plaintiffs.

Betamethasone is an antenatal steroid, also referred to as a corticosteroid, given to pregnant women in an effort to mature the fetal lungs, when a preterm delivery is threatening. Preterm labor is labor occurring prior to the completion of 36 weeks of gestation, and is a major cause of infant mortality and morbidity. Terbutaline is a tocolytic agent used to control and stop preterm labor in an attempt to extend gestation. Other tocolytic agents include Ritodrine and Magnesium Sulfate.

In the medical reports, Dr. Barss recommended repeat doses of Betamethasone in two weeks. These doses were never administered to Ms. Harrison.

See AppendixA which provides atimetable outlining each of the defendants’ involvement in the care of Danielle LaSalvia.

Although the court finds Dr. McDonough qualified to opine as to the applicable standard of care, his opinion, concerning weekly doses of antenatal steroids, is not consistent with the medical literature submitted to the court. Dr. McDonough believes that the standard of care in 1992 was to administer additional weekly courses of Betamethasone to women in preterm labor and he stated that this was his standard practice. However, the National Institute of Health Consensus Conference noted that “[i]n reports from approximately 500 perinatal centers, only 12% to 18% of women who deliver preterm infants . . . are treated with antenatal corticosteroids.” 1994 NIH Consensus Conference: Effect of Corticosteroids for Fetal Maturation on Perinatal Outcomes, JAMA, February 1, 1995, p. 413. Also, as to the general acceptance of the use of antenatal steroids, a 2002 study disclosed that “[d]espite the abundance of evidence, antenatal corticosteroid treatment of women at risk of preterm birth has not been fully accepted and widely used by medical care providers." Chien et al., Variations in Antenatal Corticosteroid Therapy: A Persistent Problem Despite 30 Years of Evidence, The American College of Obstetricians and Gynecologists, Vol. 99 No.3, March 2002, p. 402 . Despite this evidence contradicting Dr. McDonough’s opinion as to the standard of care, the court finds that there is sufficient evidence to submit the issue to a jury.