Brassard, J.
On August 17, 2000, this matter was before the court for an evidentiary hearing on the motion of defendants to exclude expert testimony of plaintiffs’ experts, Dr. Don Sloan (“Dr. Sloan”), Dr. Michael Cardwell (“Dr. Cardwell”), Dr. Debra Spicehandler (“Dr. Spicehandler”), Dr. Stanley August (“Dr. August”) and Dr. Matthew Samarel (“Dr. Samarel”). Plaintiffs Brian Higgins, ppa Debra Higgins (“Brian”), Debra Higgins (“Mrs. Higgins”) and Stephen Higgins (collectively “the Higginses”), allege that the defendant physicians provided substandard care in the pregnancy management, labor and delivery, and postpartum care of Brian, and that their negligent care directly and proximately caused Brian to develop bacterial meningitis from a Group B Streptococcus infection (“GBS”), which resulted in severe and permanent neurological damage. Specifically, the Higginses assert that had Mrs. Higgins been given antibiotics during her labor and delivery or had Brian been appropriately evaluated and given antibiotics during his first days and/or weeks of life, he would not have later developed meningitis from GBS.
The defendants move to exclude the aforementioned doctors’ testimony on the standard of care of pregnant women infected with GBS, the standard of care of neonatal babies who may have been exposed to GBS and the causal link between a mother infected with GBS and her child on the grounds that it is scientifically unreliable. See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592 (1993); Commonwealth v. Lanigan, 419 Mass. 15, 27 (1994).
For the following reasons, the motion to exclude the expert testimony of Drs. Sloan, Cardwell, Spicehandler, August and Samarel is DENIED.
BACKGROUND A. Facts
At all relevant times, Mrs. Higgins and Brian received their health care coverage through Harvard Community Health Plan (“HCHP”). On April 27, 1993, Mrs. Higgins’s obstetrician, Dr. Elizabeth Stewart (“Dr. Stewart”), ordered a test to screen Mrs. Higgins for GBS. Mrs. Higgins was approximately 28 weeks pregnant at the time with her first child, Brian. On May 4, 1993, HCHP informed Mrs. Higgins that she had tested positive for GBS. She received two postcards informing her of the positive test result. The first postcard, dated May 4, 1993 read, “Your culture does *85 show beta strep growth. This is treatable during your labor at the hospital with antibiotics." The second postcard, also dated May 4, 1993, stated: “Your culture did show some strep bacteria growth, but again, that’s nothing that we’ll treat now, just something for you to be aware of . . .”
On June 25, 1993, Mrs. Higgins was admitted to Beth Israel Hospital for labor and delivery. At that time, she was between 37 and 38 weeks pregnant. Dr. Diane Kaufman (“Dr. Kaufman”) and Dr. Mindy Wiser (“Dr. Wiser") managed the labor and delivery of Mrs. Higgins and Brian. Shortly after admission, Mrs. Higgins’s labor was induced. Brian was eventually delivered with the aid of a vacuum extractor. During labor and delivery, which lasted approximately 12 hours, Mrs. Higgins received approximately 10 vaginal/pelvic examinations and had a highest recorded temperature of 99.8 F or 37.67 C. In addition, the vacuum extractor used to deliver Brian left a 4-5 centimeter wound on his scalp. Neither Mrs. Higgins nor Brian was ever given any antibiotics before, during or after delivery.
On June 28, 1993, Brian and Mrs. Higgins went home. Before Brian was released, Dr. Teresa Zabik (“Dr. Zabik”) examined Brian at three separate times and found no sign or symptoms of infection. On July '9, 1993, Dr. Gail LoPreste (“Dr. LoPreste”) examined Brian as part of a routine two-week checkup and also found no signs or symptoms of infection.
On July 18, 1993, Brian became ill. He was taken to Children’s Hospital and diagnosed as suffering from late-onset GBS, meningitis and sepsis. On September 2, 1993, Brian was discharged from Children’s Hospital. He suffered massive permanent neurological injuries as a result of his illness.
The plaintiffs’ complaint against Drs. Kaufman and Wiser[3] asserts that: (1) their failure to give Mrs. Higgins antibiotics during labor and delivery was negligent and fell below the standard of obstetrical care required in 1993 and (2) had they administered antibiotics to Mrs. Higgins during labor and delivery, Brian would not have developed late-onset GBS. Plaintiffs’ complaint against the pediatricians, Drs. Zabik and LoPreste asserts that (1) their failure to order blood tests and/or blood, urine and skin cultures and to treat Brian with antibiotics was negligent and fell below the standard of pediatric care required in 1993 and (2) had the pediatricians administered antibiotics to Brian during his first three days of life or two weeks later at his checkup, he would not have developed late-onset GBS.
B. Proposed Expert Testimony
The defendants seek to exclude all of the plaintiffs’ experts who intend to offer their opinions on standard of care and causation. The opinions proposed are specifically as follows:
1. Dr. Cardwell
Dr. Cardwell is board certified in obstetrics/gynecology and maternal-fetal medicine. Since 1997, Dr. Cardwell has been in private practice, primarily treating high-risk obstetrical patients. He published an article titled “Preventing Perinatal Early-Onset Group B Streptococcal Infections” in the Journal of Legal Medicine, December 1997, in which he discusses his research and review of the GBS standard of care. He is expected to testify as to the standard of care of an average qualified physician with respect to the treatment of women who are infected with GBS and the treatment of infants born to mothers who have tested positive for GBS. It is also expected that Dr. Cardwell will testify as to the detection, diagnosis, treatment and transmission of GBS, including such transmission from pregnant women to their newborns.
Dr. Cardwell testified at his deposition that he believes that in 1993 it was the standard of care to offer a known GBS-positive woman antibiotics during labor and delivery even in the absence of any specific GBS risk factors. Additionally, he has testified that antibiotics should be given in the presence of any general risk factors for infection during labor and delivery, including, but not limited to, multiple pelvic examinations and invasive internal monitoring of the mother or fetus, both of which were present in the labor and delivery of Mrs. Higgins and Brian.
In addition, Dr. Cardwell testified that Brian, “more likely than not acquired the bacteria from the mother” and “had the mother been treated [with antibiotics] during the intrapartum period, it’s my opinion that that would probably [have] interrupted the transmission of the bacteria to the baby.” (Cardwell Deposition at 90.)
The defendants assert that Dr. Cardwell’s opinions about monitoring for additional general risk factors are neither mentioned in any published guidelines nor in Dr. Cardwell’s own published article. Therefore, defendants argue, that given the lack of scientific testing about general risk factors, Dr. Cardwell should be precluded from testifying about his theory. In addition, the defendants assert that Dr. Cardwell’s opinion on causation is based solely on his own personal reason and logic and he has no studies or publications to support his theory.
2. Dr. Sloan
Dr. Sloan is board certified in obstetrics /gynecology. He has practiced in the area of obstetrics/gynecology for approximately 30 years. He is expected to testify that Mrs. Higgins was a high-risk obstetrics patient because of the circumstances surrounding her labor and delivery. In addition, it is proposed that he will testify that the applicable obstetrics/gynecology standard of care required healthcare providers to provide or at least offer antibiotics, given that Mrs. Higgins *86 was considered a high-risk patient, during labor and delivery.
Specifically, Dr. Sloan testified at his deposition that he believes that although the general accepted standard of care calls for treating a woman with antibiotics during labor and delivery only if any one of five enumerated risk factors are present, that is only one part of the standard of care. Dr. Sloan’s belief is that a patient must be looked at in a complete picture and that there were other complicating factors in Mrs. Higgins’s labor and delivery that should have alerted the doctors that she should be administered antibiotics.
In addition, Dr. Sloan has testified that he believes that giving antibiotics to Mrs. Higgins during labor and delivery would have most likely prevented Brian from developing GBS.
Defendants assert that Dr. Sloan has failed to provide any objective, verifiable, testable or tested methodology to support his conclusions either about the standard of care or about causation in that he has pointed to no study, test or literature, published or peer-reviewed, that supports his theory of the course of treatment.
3.Dr. Spicehandler
Dr. Spicehandler is board certified in internal medicine and infectious diseases. She specializes in infectious diseases. She is expected to testily as to the detection, diagnosis, treatment and transmission of GBS infections as well as prophylactic measures available to treat infants born to mothers who carry GBS. In addition, it is expected that Dr. Spicehandler will testify as to the average qualified medical practitioner’s practices with regard to managing the condition of infants born to GBS mothers.
Dr. Spicehandler testified at her deposition that she believes that the abrasion on Brian’s scalp put him at a higher risk for contracting GBS„immediately after Brian’s birth, and/or a few days after his birth. In her opinion, the treating physicians should have taken a culture of the wound to test for GBS. She also testified that she believes that Brian contracted late-onset GBS from his mother via his bloodstream and that had he been given antibiotics shortly after birth it would have prevented the onset of the infection.
Defendants assert that Dr. Spicehandler’s testimony is neither reliable nor relevant in that, among other things, she has never treated a neonate (an infant in the first 30 days of life) and she has never treated a child less than 90 days old for any illness related to GBS. Defendants also assert that Dr. Spicehandler has not reviewed any of the most relevant literature and publications on GBS in general and/or such materials as relate to the specifics of this case. They argue that she is unfamiliar with published research and literature on infectious diseases in infants.
4.Dr. August
Dr. August is board certified and specializes in pediatrics. He has been practicing pediatrics for approximately 25 years. He is expected to testify that it is the appropriate standard of care for an obstetrician to communicate any unusual aspects of a patient’s pregnancy, labor and delivery to the pediatricians attending to the newborn infant. In addition, he is expected to testify that the average qualified physician should make an inquiry as to the history of the woman's pregnancy and whether there were any abnormalities or unusual occurrences during the pregnancy, labor or delivery.
Dr. August testified at his deposition that Dr. Zabik, the pediatrician who examined Brian during his first three days of life, failed to do a complete “work up” on Brian and subsequently treat him based on the results of the “work up.” Based on his experience and given that Brian experienced a traumatic birth, Dr. August believes that Brian should have been given a complete blood count, and that a urine culture and a culture of the abrasion on his head should have been taken. He also believes that generally, traumatic delivery increases the risk of infection. Defendants assert however, that Dr. August can cite to no authority, publication or personal experience to support this theory.
Dr. August also testified that Dr. LoPreste, at Brian’s two-week checkup, should have done a complete blood count because there would be a good chance that some abnormality, given Brian and Mrs. Higgins’s medical history, would have appeared. Again, defendants assert that Dr. August can point to no publications or examples from personal experience to support his claim that Brian’s traumatic birth, scalp laceration and initial floppiness at birth, increased his risk of developing late-onset GBS.
5.Dr. Samarel
Dr. Samarel specializes and is board certified in pediatrics. He was the director of inpatient pediatrics at Newton-Wellesley Hospital from July 1992 through February 2000. Dr. Samarel treats infants with GBS in his practice and also did so as a resident. He is expected to testify as to the care that Brian should have been given immediately following his birth.
Dr. Samarel testified at his deposition that he believes that the scalp lesion on Brian’s head should have been cultured and tested and that Brian should have been treated with antibiotics. He bases his opinion on his own experience. He also testified that, based on his own clinical experience, Dr. LoPreste, at Brian’s two-week checkup visit, should have consulted with an infectious disease specialist in light of Brian’s medical history.
Dr. Samarel also testified that had Brian been given antibiotics either at birth, in the few days after birth, or even at his two-week checkup, it would have “blunted” if not altogether abated the development of GBS.
*87 Defendants argue that Dr. Samareis claims are vague and based on "unremembered readings” as well as his clinical experience. They point to the fact that as of 1993, Dr. Samarel had only been practicing for 11 months and even to date, his experience with late-onset GBS is nonexistent.
DISCUSSION
A. Daubert/Lanigan Standard
In determining the admissibility of scientific evidence, the court must act as a gatekeeper to determine whether expert evidence should be admitted. The evidence must satisfy a two-prong test of relevancy and reliability. See Daubert v. Merrell Dow, supra; Commonwealth v. Lanigan, supra. An expert may present opinions “that will assist the trier of fact to understand the evidence or to determine a fact in issue.” Daubert at 588. Experts may testify to opinions and base those opinions on facts and data not in evidence. Id. See also Sacco v. Roupenian, 409 Mass. 25 (1990); Department of Youth Services v. A Juvenile, 398 Mass. 516 (1986).
An expert must be able to demonstrate that his conclusions “have a reliable basis in the knowledge and experience of his discipline.” Daubert at 590. “Knowledge” is defined as connoting “more than subjective belief or unsupported speculation.” Id. In order to satisfy this standard of evidentiary reliability, an expert witness must show that his opinions “have been arrived at in a scientifically sound and methodologically reliable fashion.” See Ruiz-Troche v. Pepsi-Cola of Puerto Rico, 161 F.3d 77, 85 (1st Cir. 1998); Daubert at 590. The issue in this case is whether the plaintiffs’ expert witnesses on standard of care and causation satisfy this standard.
In determining whether an expert may testify as to the standard of care, “the crucial issue is whether the witness has sufficient ‘education, training, experience and familiarity’ with the subject matter of the testimony.” Letch v. Daniel, 401 Mass. 65, 68 (1987), quoting Gill v. North Shore Radiological Assocs., 10 Mass.App.Ct. 885, 886 (1980). To present expert testimony to the jury, however, an expert “need not be a specialist in the area concerned nor be practicing in the same field as the defendant.” Id.
To determine whether expert testimony is admissible, the court must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is valid within the expert’s field, and whether the reasoning or methodology properly can be applied to the facts at issue. Commonwealth v. Lanigan, 419 Mass. 15, 26 (1994), quoting Daubert at 592-93. Contrary to the contention of the plaintiffs, this court concludes that standard of care testimony, like any other proffered expert testimony, must satisfy Daubert and Lanigan. “There is no logical reason why conclusions based on personal observations or clinical experience should not be subject to the Lanigan analysis.” Teresa Canavan’s Case, 432 Mass. 304 (2000). The focus of the inquiry is not on the conclusions reached by the expert, but rather on the reliability of the principles and methodology used by the expert. Daubert at 595. Conclusions and methodology, however, are not “entirely distinct from one another.” See General Electric Co. v. Joiner, 522 U.S. 136. 146 (1997). In deciding whether an expert's testimony is reliable, the court may consider whether the theory 1) has been subjected to publication and peer review; 2) has been tested; 3) has a known error rate; and 4) has general acceptance in the relevant discipline. Lanigan at 25. In Massachusetts, the courts have determined that “in most cases general acceptance will be the significant and ‘often the only, issue.’ ” Teresa Canavah's Case, quoting Lanigan at 26. “Thus, we have concluded that a party seeking to introduce scientific evidence may lay an adequate foundation either by establishing general acceptance in the scientific community or by showing that the evidence is reliable or valid through an alternative means.” Teresa Canavan’s Case. See also Commonwealth v. Sands, 424 Mass. 184, 185-86(1997).
In assessing the reliability of expert testimony, a court may apply the Daubert analysis even where the reliability determination focuses on the expert’s personal knowledge or experience. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999); Teresa Canavan’s Case, supra. Unsupported assertions by an expert do not constitute general acceptance. See Keene Corp. v. Hall, 626 A.2d 997, 1004 (Md.Appeal1993).
B. Admissibility of Testimony 1. Drs. Sloan, Cardwell, August and Samarel
As previously stated, it is an expert’s methodology, not his or her conclusions that must be examined under the Lanigan standard. “The purpose of the Lanigan test is to prevent an expert from offering testimony to a fact finder that is not based on reliable methodology.” Teresa Canavan’s Case. In the case of the aforementioned doctors, this court finds that the methodology all four doctors utilized in reaching their conclusions as to the obstetric and/or pediatric standard of care in 1993 and as to causation, is sound and generally accepted in their fields. “The gatekeeping function pursuant to Lanigan is the same regardless of the nature of the methodology used: to determine whether ‘the process or theory underlying a scientific expert’s opinion lacks reliability [such] that [the] opinion should not reach the trier of fact.’ ” Teresa Canavan’s Case, quoting Commonwealth v. Lanigan, 419 Mass. at 26. Furthermore, “in many cases personal observation will be a reliable methodology to justify an expert’s conclusion. If the proponent can show that the method of personal observation is either generally accepted by the relevant scientific community or otherwise reliable to support a scientific conclusion relevant to the case, such expert testimony is admissible." Teresa Canavan’s Case.
*88 In this case, Drs. August, Cardwell, Sloan and Samarel all offer opinions that, based on the Daubert/Lanigan standard, are reliable and relevant. The defendants’ arguments and assertions that the doctors are unable to cite to publications that support their conclusions, or that their opinions are simply supported by their personal observations and experience, or that, as of 1993. they did not have enough experience in the field to make a conclusion (Dr.Samarel), all go to the weight of the evidence. While it is clear that each of these expert witnesses will offer opinions that are sharply contested by the defendants, it is also clear that the opinions of these experts are not so lacking in reliability that they should not reach the finder of fact. Thus, they are questions for a jury and not for a gatekeeper. Further, this court finds that the witnesses have sufficient education, training, experience and familiarity with the subject matter to testify at trial. See Letch v. Daniel, 401 Mass. at 60.
2. Dr. Spicehandler
Although the above discussion and conclusion also relates to Dr. Spicehandler, the defendants’ primary assertion against Dr. Spicehandler’s testimony is that she is an adult infectious disease specialist and does not have enough, if any at all, experience with pediatric infectious diseases in order to reach her conclusions. As noted, to present expert testimony to the jury, an expert, “need not be a specialist in the area concerned nor be practicing in the same field as the defendant.” Gill v. North Shore Radiological Assocs., 10 Mass.App.Ct. at 886.
Dr. Spicehandler clearly has education, experience, training and familiarlity in the field of infectious diseases. Furthermore, this court finds that under the Lanigan standard, her experience is both reliable and relevant. The questions that arise in the area of her experience with relation to pediatric infectious diseases go towards the weight of her testimony and, therefore, are proper questions for the finder of fact to consider.
ORDER
For the foregoing reasons, it is hereby ORDERED that defendants’ motion to exclude expert testimony is DENIED.

Plaintiffs have subsequently agreed to dismiss their complaint against Dr. Wiser.