van Gestel, J.
This matter is before the Court on the eve of trial on the defendants’ motion for summary *7 judgment (Paper #88), and the defendants’ motion in limine to exclude certain expert testimony (Paper #94).

BACKGROUND

Boston Partners Asset Management, L.P. (“BPAM”), is a Boston-based investment firm, founded to manage large cap, mid cap and small cap value products, and other specialty investment products. 
Until his resignation in June 2001, the defendant Wayne Archambo (“Archambo”) had been employed by BPAM as a limited partner and senior portfolio manager in charge of its small and mid-cap value products. Upon his resignation, Archambo sought to be employed by BlackRock, a direct competitor of BPAM. This spawned a lawsuit before this Court captioned Boston Partners Asset Management, L.P. v. Wayne Archambo, Suffolk Civil Action No. 01-3078 BLS. The lawsuit concerned, among other thing, the enforcement by BPAM of a one-year non-competition covenant in connection with Archambo’s affiliation with it.
On September 7, 2001, BPAM, Archambo and BlackRock entered into a settlement agreement in Civil Action No. 01-3078. Pursuant to the agreement BPAM agreed that Archambo could begin working at BlackRock on January 1, 2002, and could consult for BlackRock starting one month earlier. Additionally, BPAM, Archambo and BlackRock agreed that they would not disparage each other. The non-disparagement clause reads as follows.
It is the intention and agreement of the Parties that there will be no authorized representations or statements made by any of the Parties, including without limitation, those made anonymously, that shall either directly in the form of oral or written statements or representations to any existing, prospective or potential customer of any other parly, or indirectly in the form of oral or written statements or representations made to any investment or other consultant, agent or representative of any existing, prospective or potential customer of a party, or to any representative or agent of the media, disparage any party’s past, present, or future performance, personnel, financial condition or investment advisory or organizational capabilities. The term “disparage" shall mean any statement or representation which directly or by implication, is intended to harm the reputation of any Party.
(Emphasis added.)
BPAM alleges that, despite a January 16, 2001, assurance from BlackRock’s counsel that Archambo had been reminded of his non-disparagement obligations, Archambo, on January 17, 2001, “trashed” BPAM to an investment consultant named Peter Keliuotis of Strategic Investment Solutions, Inc.
Further, BPAM claims that in September 2002, Archambo made disparaging comments to one of BPAM’s largest clients, The California Endowment.
Still further, BPAM charges that in November 2002, Archambo made “damning allegations” about poor management performance by one of Archambo’s successors to R. Scott Cooprider of Holbein Associates.
This suit was filed on December 16, 2002. The complaint contains three counts: Count I, for breach of the non-disparagement clause; Count II for intentional interferences with advantageous business relations; and Count III for unfair competition in violation of G.L.c. 93A.
BlackRock fired back with counterclaims for abuse of process and unfair competition in violation of G.L.c. 93A.[2]
The essence of the motion for summary judgment is that extensive discovery reveals that BPAM cannot demonstrate an essential element of each of its claims: that it suffered any damages that were caused by the alleged disparaging remarks and that BPAM cannot proffer evidence in support of the other requisite elements of any of the three counts of its complaint.
The motion in limine asks the Court to enforce its gatekeeper role and bar certain opinion testimony by two expert witnesses designated by BPAM: Desmond J. Heathwood (“Heathwood”) and Thomas J. Lucey (“Lucey”). The expert reports of Heathwood and Lucey are attached to the Joint Pre-Trial Memorandum as Exhibit A.

DISCUSSION

Motion for Summary Judgment

“Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmov-ing party, all material facts have been established and the moving party is entitled to judgment as a matter of law.” M.P.M. Builders, LLC v. Dwyer, 442 Mass. 87, 89 (2004); Kesler v. Pritchard, 362 Mass. 132, 134 (1972). Mass.R.Civ.P. Rule 56(c).
Because the burden is on the movant, the evidence presented is always construed in favor of the party opposing the motion, and the opposing party is given the benefit of all reasonable inferences that can be drawn from it. See, e.g., Ng Bros. Constr., Inc. v. Cranney, 436 Mass. 638, 643-44 (2002), and cases cited'. “A court should not grant a party’s motion for summary judgment ‘merely because the facts he offers appear more plausible than those tendered in opposition, or because it appears that the adversaiy is unlikely to prevail at trial.’ ” Attorney Gen. v. Bailey, 386 Mass. 367, 370 (1982).
Goulart v. Canton Housing Authority, 57 Mass.App.Ct. 440, 441 (2003).
Thus, here, the evidence presented in the motion papers must be viewed in the light most favorable to BPAM, including any reasonable inferences to be drawn therefrom.
While the record that BPAM suffered any damages that were caused by the alleged disparaging remarks *8 is truly thin, it does not appear to this Court to fail to achieve the very limited deference that it must be given under Rule 56.
The trial judge must only determine “whether there is a substantial issue of fact. He does not . . . try such issue if found to exist.” He need not, therefore, concern himself with the credibility of opposing affidavits or evidence, or the weight of the evidence.
Smith & Zobel, Rules Practice, 8 M.P.S. sec. 56.8.
The Court reaches the same conclusion on the charge that BPAM cannot proffer sufficient evidence in support of the other requisite elements of any of the three counts of its complaint. Thus, the defendants’ motion for summary judgment must be denied.

Motion in Limine to Bar Expert Testimony

This motion presents a much more complex and significant issue for this case. It asks the Court to perform the gatekeeper role assigned by the Supreme Court’s decision in Daubert v. Merrell Dow Chemicals, Inc., 509 U.S. 579, 591 (1993), as brought into Massachusetts evidence law by Commonwealth v. Lanigan, 419 Mass. 15, 25 (1994). See also Theresa Canavan’s Case, 432 Mass. 304 (2000).
Our test for the admissibility of expert testimony based on scientific knowledge has usually been the Frye test, “that is, whether the community of scientists involved generally accepts the theory or process. Frye v. United States, 293 F. 1013 (D.C.Cir. 1923).” . . . The test has a practical usefulness because, if there is general acceptance in the relevant scientific community, the prospects are high, but not certain, that the theory or process is reliable. The ultimate test, however, is the reliability of the theory or process underlying the expert’s testimony . . . Thus we have recognized the risk that reliable evidence might be kept from the factfinder by strict adherence to the Frye test. . . Perhaps the relevant scientific community has not yet digested and approved the foundation of the theory or process, but the theory or process is so logically reliable that evidence should be admitted even without its general acceptance by involved scientists. In some circumstances, perhaps without adequately articulated reasons, we simply have decided that Frye principles do not apply in deciding on the admissibility of expert testimony apparently based on a scientific theory or process. See Geiger, The Judicial Gatekeeper: Should Massachusetts Apply Daubert to Screen Expert Testimony?, 79 Mass.L.Rev. 94, 98-99 (1994).
The Commonwealth urges us to adopt the reasoning of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), in which the Supreme Court determined that, by adoption of Rule 702 of the Federal Rules of Evidence, the Frye test had been abandoned in the Federal courts . . . That rule, which is the same as Rule 702 of the Massachusetts Proposed Rules of Evidence, reads as follows: “If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.”
In its Daubert opinion, the Court recognized that general acceptance by the scientific community was a relevant factor in determining the admissibility of expert testimony based on a scientific theory or technique . . . But such acceptance, the essential ingredient of the Frye principle, is not the sole test . . . The Court thought relevant the question whether the theory or technique can be or has been tested ... Peer review and publication of the theory or process is pertinent but also not an indispensable predecessor of admissibility . . . The Daubert opinion finds a requirement of reliability implicit in rule 702, which on its face uses helpfulness to the trier of fact as the test of admissibility of expert testimony based on scientific knowledge.
The general proposition set forth in the Daubert opinion seems sound, although that opinion gives little guidance for the application of that proposition to the facts of a given case . . . The expert’s opinion must “have a reliable basis in the knowledge and experience of his discipline.” . . . The overarching issue is “the scientific validityand thus the eviden-tiary relevance and reliabilityof the principles that underlie a proposed submission . . . The trial judge has a significant function to carry out in deciding on the admissibility of a scientific expert’s opinion. If the process or theory underlying a scientific expert’s opinion lacks reliability, that opinion should not reach the trier of fact. Consequently, the judge must rule first on any challenge to the validity of any process or theory underlying a proffered opinion. ’’This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." . . . The judge thus has a gatekeeper role. Of course, if the judge rules the opinion evidence admissible, that ruling is not final on the reliability of the opinion evidence, and the opponent of that evidence may challenge its validity before the trier of fact.
We accept the basic reasoning of the Daubert opinion because it is consistent with our test of demonstrated reliability. We suspect that general acceptance in the relevant scientific community will continue to be the significant, and often the only, issue. We accept the idea, however, that a proponent of scientific opinion evidence may demonstrate the reliability or validity of the underlying scientific theory or process by some other means, that is, without establishing general acceptance.
*9 Lanigan, supra, 419 Mass. at 24-26.
The reach of Daubert, of course, has moved beyond just scientific expert opinion. See Kumbo Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999). Massachusetts seems to be moving in the same direction. See Theresa Canavan’s Case, supra, 432 Mass, at 313.
While Massachusetts has not consigned the Frye test to the waste basket, certainly if expert evidence can meet the Frye test it will readily pass the Daubert test. And, of course, if the expert evidence will not pass Daubert, it is not necessary to look to the more restrictive Frye requirements.
Consequently, this Court must determine whether BPAM’s proposed opinion evidence may demonstrate the reliability or validity of an underlying theory or process by some other means, that is, without establishing general acceptance. The parties’ significant arguments focus on the reliability of the proffered opinions, although relevance to the three particular causes of action is also challenged.
The Court begins with BPAM’s expert reports. They provide a mixed proffer of evidence. Each of Heathwood’s and Lucey’s reports deal with issues relating to their experience and knowledge in the money management industry: competition in the industry: BPAM’s vulnerability to reputational damage; why disparagement by someone like Archambo poses a threat; and the importance of consultants in the industry and why Archambo’s disparagement may be harmful. These matters seem to fit within the Daubert/Lanigan concept of acceptable reliable expert testimony.
Two other areas of Heathwood’s and Lucey’s expert reports, however, go over the line. They relate to opinions as to why the specific instances of disparagement discovered by BPAM may just be the “tip of the iceberg,” and, more significantly, the extent to which the alleged disparagement harmed BPAM’s reputation.
The first of these two areas of opinionthat the specific instances of disparagement discovered by BPAM may just be the “tip of the iceberg”is, on its face, pure speculation of a kind not appropriate for either “expert” opinion or any other form of testimony. “Damages must not be speculative but must be established ‘upon a solid foundation in fact.’ ” Santana v. Registrars of Voters of Worcester, 398 Mass. 862, 867 (1986). See also, e.g., National Merchandising Corp. v. Leyden, 370 Mass. 425, 430 (1976).
The secondthe extent to which the alleged disparagement harmed BPAM’s reputationis unreliable and, therefore, should not be admissible. To consider this issue, the penultimate statements in each of Heathwood’s and Lucey’s reports must be examined. In the utter absence of any analysis, study or contention of support, Heathwood and Lucy say:
[Heathwood] Based on the foregoing, based on my education, and years of experience, and based on my familiarity with the matters in dispute, it is my opinion that Boston Partners suffered an injury to its business reputation and business prospects as a result of disparagement by Mr. Archambo. I believe the dollar amount of damages suffered by Boston Partners, while difficult to calculate to a mathematical certainty, is under no circumstances less than $25,000,000. This measure of damages is a conservative figure. I believe the measure of damages could be higher, particularly given that it has and will take a significant amount of time to improve Boston Partner’s damaged business reputation.
[Lucey] Given the size of Boston Partners and the nature of the comments by Archambo, I say with confidence that the injury to Boston Partners’ reputation exceeds $10,000,000, and could be as high as $30,000,000.
First the Court will assess the issue of reliability. As the S.J.C. in Lanigan states, it is the “reliability of the theory or process underlying the expert’s testimony” that is crucial. Lanigan, supra 419 Mass, at 24. The gatekeeper Court is expected to test “whether the theory or technique [that leads to the opinion] can be or has been tested.” Id. at 25.
Here the stated field of expertise that would permit opinion testimony by Heathwood or Lucey is not identified. Further, there is no theory or technique even proffered by the opining experts and no underlying supporting data or analysis is provided. Consequently, there is nothing for the Court to assay. Thus, on the reliability prong, the ultimate opinions of Heathwood and Lucy both fail.
Further, although not as absolutely clear, the two opinions do not make it over the relevance hurdle either. General, unsupported opinions of reputational injury are not the kind of damages recoverable in claims for breach of contract, Redgrave v. Boston Symphony Orchestra Inc., 855 F.2d 888, 894 (1st Cir. 1988), intentional interference with advantageous business relations, Ratner v. Noble, 35 Mass.App.Ct. 137, 139 (1993), or unfair competition under G.L.c. 93A, Tech Plus, Inc. v. Ansel, 59 Mass.App.Ct. 12, 20-21 (2003). Consequently, evidence of reputational damages is not relevant to this case.
For the foregoing reasons, this Court must exercise its gatekeeper function and prevent testimony or documentary evidence by Desmond J. Heathwood and Thomas J. Lucey about: (1) whether the specific instances of disparagement discovered by BPAM may just be the “tip of the iceberg”; and (2) the extent to which the alleged disparagement harmed BPAM’s reputation.

*10
Case Status

Following this decision, the status of this case is as follows: BPAM’s case, on all three counts, remains alive, but, in the apparent absence of evidence of the extent of damages, in extremis; and BlackRock’s two counterclaims, for abuse of process and violation of G.L.c. 93A, remain pending. The latter counterclaims have health problems themselves. The abuse of process claim may well succumb on BPAM’s proof of a breach of contract relating to the non-disparagement clause, with an award of nominal damages. Additionally, the c. 93A claim appears predicated on the same facts as are said to constitute an abuse of process. Again, if the abuse of process case falls because of a successful effort by BPAM on the breach of contract case, even with only nominal damages to show for it, then the c. 93A claim may expire as well.
Under the circumstances, it seems fair to ask the parties to consider whether they wish to assume the expense and effort to try any part, or all, of this case in the posture that now exists. The words of Judge Kass can be heard here. “It would be an imposition on the parties to consign them to further exertions in Superior Court from which the plaintiff could expect to recover no more than one dollar in damages.” St. Charles v. Kender, 38 Mass.App.Ct. 155, 161 (1995).

ORDER

For the foregoing reasons, the defendants’ motion for summary judgment, (Paper #88), is DENIED, and the defendant’s motion in limine to exclude certain expert testimony, (Paper #94), is ALLOWED in part and DENIED in part.
The parties are requested to confer and report to the Court as to the future course of this case

Archambo also, separately, filed counterclaims. Archambo’s counterclaims, however, have been severed and transferred to Norfolk County, there to be joined with Archambo v. Boston Partners Asset Management, L.P. et at., Norfolk Civil Action No. 03-0277. See Memorandum and Order dated July 2, 2003 (Paper #27).